STATE OF LOUISIANA

VERSUS

ADAM LITTLETON

NO. 18-KA-354

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 16-2908, DIVISION "P"
HONORABLE LEE V. FAULKNER, JR., JUDGE PRESIDING


December 04, 2019


**FREDERICKA HOMBERG WICKER**
**JUDGE**


Panel composed of Judges Fredericka Homberg Wicker,
Marc E. Johnson, and John J. Molaison, Jr.


**<u>CONVICTION AND SENTENCE AFFIRMED</u>**
**FHW**
**MEJ**
**JJM**

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
      Paul D. Connick, Jr.
      Terry M. Boudreaux
      Andrea F. Long
      Kellie M. Rish
      Megan L. Gorman

COUNSEL FOR DEFENDANT/APPELLANT,
ADAM LITTLETON
      Paul J. Barker
      Kristen Legendre

**WICKER, J**.

This is an appeal of the conviction of defendant, Adam Littleton, for second-degree murder after a jury trial on July 28, 2017. On November 9, 2017, defendant was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. Defendant also appeals the trial court's admission of expert testimony in the field of human trafficking and evidence of other acts of the defendant's involvement in human trafficking under Louisiana Code of Evidence art. 404(b). As the trial court previously denied defendant's motions for new trial based on alleged sequestration violations by a State witness and *Brady* violations by the State, he appeals the denial of those motions.

For the reasons set forth below, we find no merit to the allegations and affirm the decisions of the trial court.

## FACTS

On June 10, 2015, at 4:57 a.m., emergency operators were alerted to an object, possibly a human body, lying in the center lane of westbound Interstate 10. Louisiana State Police and the Jefferson Parish Sheriff's Office (JPSO) found a trail of blood, body parts, sandals, a cellular phone, clothing, a hair piece, and a watch from the Veterans on-ramp to the Power exit. After analyzing the victim's fingerprints and cellular phone, the police identified the body as nineteen-year-old Jasilas Wright. After speaking to the victim's friends and family members and searching the home of the victim's mother, Nedra Wright, defendant, Adam Littleton, was identified as a suspect.

Testimony at trial revealed that the victim had known defendant for less than a month. Defendant had traveled to New Orleans from Texas on May 14, 2015, with Quinicsha Johnson, a prostitute. While staying at the Monteleone Hotel, defendant met the victim through her work as a dancer at Stiletto's, a Bourbon

Street strip club.[1]  Within a few days, the victim left New Orleans with defendant, telling family members that she was going to dance in Texas with some girls from her work.  Defendant and the victim thereafter stayed in hotels in Ft. Worth, Dallas, Austin, and Grand Prairie, Texas.  In the beginning of June, the victim and defendant drove back to New Orleans in a gray Camry belonging to defendant's brother, Michael Adams.

Upon their return to New Orleans, the victim and defendant stayed with the victim's mother, Ms. Wright, at her home located at 3009 Live Oak Street.  The victim's family believed defendant was the victim's boyfriend.  According to her family, when she returned home, the victim appeared to have lost weight; she told her grandmother, Carole Bernard, that she was not going to leave New Orleans or her nine-month-old son again.  After returning to New Orleans, the victim resumed working at Stiletto's.  Defendant drove the victim to and from work, and spent time with Ms. Wright while the victim worked.

On the night of June 6, 2015, the victim went out with her friend from high school, Demonyan Cooper, and spent the night with another man.  Two days later on June 8, 2015, the victim and defendant went to Walmart's Woodforest bank where defendant opened a bank account and deposited ten dollars.[2]  On the evening of June 9, 2015, the victim went to work.  While she worked, defendant met Journae King, a former dancer, on Bourbon Street, and they exchanged text messages until 2:40 a.m. the following morning of June 10, 2015.  Defendant's cell phone records revealed that he was in downtown New Orleans at 4:20 a.m., thereafter near Loyola Drive in Kenner from 5:00 a.m. to 5:05 a.m.

---

[1] Records show defendant stayed at the Monteleone Hotel on May 14 through 16.  He also had hotel reservations at the Hyatt and Hotel Royal on May 16-17.

[2] Victim's friend, Monique Ross, testified that while working at Walmart she saw victim in the bank where victim told her that she was unable to open an account without her social security card.

On June 10, 2015, Ms. Wright realized that her daughter had not come home from work, although both her and defendant's bags were still in the house. At approximately 11:00 a.m., Journae King called Ms. Wright asking if she had seen her daughter. After speaking with Ms. King, Ms. Wright called Ms. Bernard, her mother and the victim's grandmother. Meanwhile, defendant made phone calls to Ms. Johnson, Ms. Cooper, Ms. King, as well as his brother and sister, crying and telling them that the victim had jumped out of his car on the highway. Ms. Cooper went to Ms. Bernard's house and put all phone calls from defendant on speakerphone in the presence of Ms. Bernard and officers from New Orleans Police Department (NOPD).[3]

Cell phone records show defendant continued to drive west to Dallas, Texas arriving there between 9:45 and 10:15 p.m. at the apartment of Stephanie Walker, his brother, Michael Adams' girlfriend. After hearing defendant's story, Ms. Walker confirmed the details on the internet and called the Louisiana State Police from her workplace. On June 12, 2015, Ms. Walker spoke with Trooper First Class Gus Bethea at which point she reported to the trooper that she had overheard defendant telling Mr. Adams that he could not call the police because he was scared that he was responsible. According to Ms. Walker, defendant said he had forced the victim into the car and told her the only way she was going to get out was if she jumped. Ms. Walker also overheard defendant say that he saw, in his rearview mirror, two cars run over the victim and that he stopped at the next exit to throw her belongings out of the car. Louisiana State Police and JPSO deputies arrived in Dallas, searched the Camry, and interviewed Mr. Adams and Ms. Walker. The search of the vehicle revealed defendant's bank statements from

---

[3] One of the officers was Detective Charles Haw who recorded the phone conversation on his body camera at approximately 2:30 p.m. on June 10, 2015.

Bank of America and paperwork from victim's visit to Texas Health Resources center on May 23, 2015 at 2:00 a.m. for a cervical sprain.

The coroner, Dr. Marianne Eserman, determined that the cause of the victim's death was multiple blunt force injuries, and based on law enforcement reports, the manner of death was homicide.[4] Louisiana State Police obtained two arrest warrants for defendant: one for second degree kidnapping in Orleans Parish and another for second degree murder in Jefferson Parish. Defendant turned himself in to the police in Shreveport, and he was escorted to Orleans Parish.

## PROCEDURAL HISTORY/STATEMENT OF THE CASE

On May 12, 2016, defendant was charged with second degree murder in violation of La. R.S. 14:30.1. On November 21, 2016, the State filed a Notice of Intent to Introduce Evidence of Other Acts under La. Code of Evidence art. 404(b). The State sought to introduce evidence of nine other acts proving that defendant was engaging in a prostitution enterprise to provide insight into the victim's relationship with defendant. These acts were discovered by law enforcement after speaking to the victim's family and friends and searching the victim and defendant's phone records, Instagram accounts, email accounts, and bank records. The State argued that the evidence was relevant to the essential element that the victim was not a willing occupant of the defendant's vehicle. After a hearing of the contested motion on January 11, 2017, the trial court granted the introduction of evidence over defense objection.

On May 30, 2017, the State filed a Notice of Intent to offer Lieutenant William Hare, the Commander of JPSO vice unit, as an expert in the field of human trafficking. On July 18, 2017, the State filed a motion for a pre-trial

---

[4] Dr. Eserman testified that the presence of caffeine, nicotine, and cocaine metabolite were detected in the toxicology screening, however, the victim would not have been under the influence of cocaine at the time of her death.

hearing to qualify Lieutenant (Lt.) Hare as an expert, which defense counsel opposed. At the July 24, 2017 hearing was held on, and the trial court found that based on his training, education, and experience in the field, Lt. Hare was qualified testify as an expert, specifically in the culture, language, advertising, and arranging of prostitution; transportation and locale of prostitution; and recruiting and control methods of pimps.

The case thereafter proceeded to trial before a twelve-person jury on July 24, 2017. At the trial, as a result of the admission of Other Acts evidence, the jury heard testimony from Trooper Bethea that provocative photographs of the victim, as well as the phone numbers of the victim and defendant, were posted on a classified website called "Backpage.com" with a section for advertisements for sexual services. The account associated with the postings was registered to defendant's email address, "rolathegreat@gmail.com." During the same dates as the postings, email confirmations from travel websites were sent to defendant's email account for hotel reservations in corresponding cities.[5] Defendant's Instagram account "Chulonamesip" and "Dakota3457" included posts boasting about being a pimp.[6]

Detective Lincoln testified that records from Backpage.com contained postings of the victim and Ms. Johnson, using their own and generic photographs. After reviewing the victim's phone records, investigators discovered text messages between the victim and defendant relating to fees, locations, hotel rooms, and condoms. There were also texts between them fighting and declaring their love for one another. Defendant apologized to the victim for "the Texas trip." The victim

---

[5] The Backpage account was opened in April 11, 2015 with an advertisement in Dallas. The advertisements and hotels bookings continued to Denver, Colorado (April 17-19), Addison, Texas (April 22), Ft. Worth, Texas (April 23-24), Dallas, Texas (April 27-28), Kansas City, Missouri (April 29-May 5), Dallas (May 6-9), Houston, Texas (May 9-14), New Orleans (May 14-17), Ft. Worth (May 18), Dallas (May 20-23), Austin, Texas (May 25-30), Grand Prairie, Texas (May 31)

[6] "Sip" was defendant's nickname according to the testimony of Trooper Bethea, Officer Matthew Cole Helton, and Ms. King.

5

received texts from other people wanting to recruit her in which she related that she had "a daddy."

The State called Quinichsa Johnson who testified that she had met defendant in Dallas in April 2015. She first became involved in prostitution in 2013.[7] Her friend "Cash" had taught her how to post ads on Backpage.com. Ms. Johnson testified that after meeting defendant, he "casually" took part in "making sure everything was okay." At her request, defendant would obtain hotel rooms for her since Ms. Johnson was only twenty years old. Defendant would put her money in his bank account because she "didn't like walking around with cash." She felt that it was "more of a bodyguard situation." While they were together, they lived in hotels in Texas, and also traveled to Denver for festivals and Kansas City to see her sick godfather. They went to Louisiana for "the Bourbon Street life." Ms. Johnson testified that defendant met the victim in New Orleans, and the two of them left in defendant's two-seater car. She took the bus and met up with them in Texas. Ms. Johnson started posting ads with the victim on Backpage.com "some days later." Ms. Johnson testified that the victim wanted to leave Texas to see her child, and the victim and defendant would sometimes argue. Ms. Johnson started to get jealous of victim's and defendant's relationship, and left them while in Austin in June 2015. She blocked defendant's number and he then sent her threatening text messages.[8] When he called her several times on the morning of June 10, 2015, she answered the phone. While crying and hysterical, defendant told her that the victim had jumped out of the car due to an argument.

Officer Matthew Cole Holton with the Addison Police Department in Texas testified that he was dispatched to a theft call at the Holiday Inn in Addison, north

---

[7] Ms. Johnson went by the names "Star" and "Breanna."
[8] Ms. Johnson testified that she did not think the defendant was going to physically hurt her, and he never originated the conversation about pimping. During her direct examination, she revealed that she has sent letters and money to defendant in jail, telling him that she misses him and wants to be with him when he gets out.

6

of Dallas, where the victim was staying with defendant and Ms. Johnson, on the evening of May 23, 2015, where he spoke to the victim who was upset, telling him defendant stole $200 out of her bag. Officer Holton testified he escorted the victim to her hotel room after she related that another female named "Star" would not let her inside the room, but the hotel room was empty.[9]

After this incident, Ms. Bernard received a phone call from the victim who told her grandmother she wanted to go home because "they" took all her money and left her. On May 23, 2015 at approximately 11:00 p.m., Ms. Bernard contacted a family friend in Houston, Deshon Johnson. Deshon Johnson spoke to the victim at the hotel, and purchased a ticket for her on a bus scheduled to leave Dallas for Houston on May 24, 2015 at 7:15 a.m. The victim did not respond to further calls and texts, but the hotel clerk told Deshon Johnson that the victim had left with "Michael."

Demonyan Cooper, the victim's friend from high school, testified that she had spoken to the victim while she was in Texas. Ms. Cooper testified that she saw bruising on the victim when they were getting dressed after the victim's return to New Orleans. When Ms. Cooper asked her, the victim attributed the bruising to dancing on a pole. The defense moved for a mistrial, arguing that the State never provided disclosure about the victim's bruising or its source prior to trial. The trial court denied the motion for mistrial.

Journae King next testified that she had met defendant on Bourbon Street outside of a club on June 9, 2015. As a former dancer, she believed that he had the "vibe" of being a pimp. They spoke over text message and he admitted to her that he was in "that lifestyle," but wanted to leave it and have a relationship with her. When she next spoke to defendant at 12:41 p.m. on June 10, 2015, he told her the

---

[9] Ms. Johnson also testified to an incident in Texas where a hotel called the police and the victim made a report.

7

victim had jumped out of the vehicle but he was afraid to stop because the victim had put a warrant out for him in Texas. Ms. King asked for victim's family's phone number to ascertain if the victim had made it home. Defendant told her not to tell the family that he was headed to Texas. She thereafter turned their text messages over to law enforcement.

Stephanie Walker also testified that defendant had previously come to her and Mr. Adams' apartment with a female he identified as his prostitute. In May 2015, he had returned to the apartment with two females and borrowed Mr. Adams's vehicle in order to have room for both women.[10] Defendant failed to return the car and Mr. Adams had to call their father to get defendant to agree to return the car on June 6, 2018.

Prior to Ms. Walker's testimony, the Assistant District Attorney disclosed to the trial court that Ms. Walker had seen media coverage of the trial. Ms. Walker testified that she had watched five to six minutes of the local news which reported "Adam hit his girlfriend with his car." She stated that before seeing the story she had not been previously instructed by the District Attorney's office to not watch the news. The defense requested that her testimony be barred for violating the sequestration order because her testimony was tainted by contact with all of the previous testimony in the case. The Court denied the motion to strike Ms. Walker's testimony.

Finally, Lieutenant Hare testified as an expert to the subculture of pimps and prostitutes called "the game."[11] He explained to the jury the difference between prostitution, in which a female solicits customers for a sexual act, and human trafficking, which involves someone forcing or coercing a prostitute to perform or

---

[10] Ms. Walker testified that defendant had previously stayed in the apartment in February 2015 for a few weeks.
[11] Defendant renewed his objection to Lt. Hare as an expert, as he had not previously been deemed an expert in any court, had never been the lead in a sex trafficking case, had never published articles, and there had been no peer review of his lectures.

solicit. He explained terms that were used in the victim's and defendant's text messages, including "dates" (jobs), "in-call" (where the client comes to the prostitute), "out-call" (where the prostitute goes to the client's location), "doubles" (a job with two prostitutes), and "daddy" (pimp).[12] He discussed the control methods used by pimps, including the mind games of a "Romeo" pimp and the physical control of a "Gorilla" pimp. Lt. Hare discussed a five-part manipulation system used by pimps to recruit prostitutes for trafficking which includes: 1) the recruiting phase, during which a pimp uses flattery on a vulnerable person; 2) a seduction phase during which he cares for the person and buys her things as an investment; 3) an isolation phase during which the prostitute becomes emotionally and financially dependent on the pimp while he attempts to distance her from family and friends; 4) the coercion and violence phase, when the pimp manipulates the prostitute into thinking that she is responsible for making their "dream" come true through withholding affection or physically and mentally abusing the victim; and 5) the refraining stage when the pimp changes the prostitute's identity, including branding her with a tattoo as if she is his property.

Lt. Hare testified that he reviewed the text messages, photographs, Instagram accounts, hotel receipts, and Backpage.com advertisements in this case. He related to the jury that defendant's Instagram account contained "pimp bragging" posts, and his user name "Chulonamesip" contains the Spanish word for pimp. He testified that defendant's texts relating to the amount of money and time spent on dates were consistent with human trafficking. With regard to the text conversation with Ms. King, Lt. Hare opined it contained seductive, recruiting language consistent with trafficking. In his experience interviewing victims, victims will

---

[12] Lt Hare also discussed terms not mentioned in the text messages but relating to the pimp-prostitute relationship, including "circuits" (group of cities that pimps travel to with prostitutes, including taking place on the internet), "bottom bitch" (the female who has been with the pimp the longest and may have special privileges), and terms such as "stable" and "family" to refer to groups of prostitutes.

often call pimps their "boyfriend" or "bodyguard" and minimize their behavior. He testified that defendant's bank account substantially increased in April and May, which is consistent with the pimp's goal of "all about the money."[13] He also testified that promises of a relationship, money, and love were coercive tactics. On redirect, Lt. Hare testified that although defendant was not a "sophisticated" pimp, his behavior was consistent with involvement in human trafficking.

On July 28, 2017, the jury returned a guilty verdict to the charge of second degree murder. On September 12, 2017, defendant filed a motion for a new trial based on newly discovered evidence, that being outstanding arrest warrants for Ms. Walker at the time of trial, as well as on the trial court's failure to exclude Ms. Walker's testimony as a violation of the sequestration order, the State's failure to disclose to the defense before trial Ms. Cooper's testimony regarding the bruising, and the trial court's admission of the other acts evidence. The court heard the motion on October 27, 2017, and after taking the matter under advisement, denied the motion for new trial on November 9, 2017. Defendant was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence on November 9, 2017. Defendant filed a timely motion for appeal alleging five assignments of error.

**Discussion**

Assignment of Error Number One

In defendant's first assignment of error, he alleges that the State failed to prove beyond a reasonable doubt that he was guilty of second degree murder since the evidence offered was insufficient to prove he committed the underlying felony

---

[13] Defense counsel cross-examined Lt. Hare as to defendant's recent entry into the lifestyle, pointing to defendant's bank records showing that before he started staying in hotels on April 16, 2015, he was eating fast food every day. Additionally, the seven bank deposits made by the defendant occurred before he met the victim. Defense counsel pointed out that the victim's phone records show her trying to setting up threesomes and texting "Daddy" about a new girl for the team prior to meeting defendant.

of second degree kidnapping. He argues that the only evidence presented as to the kidnapping charge was Ms. Walker's testimony which he believes should have been excluded.

The constitutional standard for testing the sufficiency of the evidence, as enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Ortiz*, 96-1609 (La. 10/21/97), 701 So.2d 922, 930, *cert. denied*, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). A reviewing court is required to consider the entire record and determine whether a rational trier of fact would have found the State proved the essential elements of the crime beyond a reasonable doubt. *State v. Price*, 00-1883 (La. App. 5 Cir. 7/30/01), 792 So.2d 180, 184. When circumstantial evidence is involved, the reviewing court must evaluate the evidence in a light most favorable to the State and determine whether a possible alternative hypothesis is sufficiently reasonable for a rational juror to not have found proof of guilt beyond a reasonable doubt. *State v. Mitchell*, 99-3342 (La. 10/17/00), 772 So.2d 78, 83. The reviewing court must defer "rational credibility calls, evidence weighing and inference drawing" to the trier of fact, and not re-evaluate the credibility of witnesses or re-weigh the evidence. *State v. Caffrey*, 08-717 (La. App. 5 Cir. 5/12/09), 15 So.3d 198, 202, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297.

Under the felony murder theory of second degree murder, defined by La. R.S. 14:30.1(A)(2), the State was required to prove the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of an enumerated felony, even though he has no intent to kill or inflict great bodily harm. *State v. Lewis*, 05-170 (La. App. 5 Cir. 11/29/05), 917 So.2d 583, 589-90, *writ*

11

*denied*, 06-0757 (La. 12/15/06), 944 So.2d 1277. Second degree kidnapping, defined by La. R.S. 14:44.1, is one of the enumerated felonies, and requires the physical injury of a victim during either: "(1) the forcible seizing and carrying of any person from one place to another; or (2) the enticing or persuading of any person to go from one place to another; or (3) the imprisoning or forcible secreting of any person."

In our examination of the essential elements necessary to support the conviction of second degree murder while engaged in second degree kidnapping, we find the State presented sufficient evidence of all elements. For the element necessary to prove the kidnapping, the State presented evidence of all three theories of kidnapping.

The State presented evidence from which the jury could reasonably infer that the victim was forced into defendant's vehicle. Ms. Walker testified that defendant said he had to "rough her up" to get the victim in the vehicle. Ms. King and Ms. Johnson testified that defendant admitted that he and the victim were having an argument in the vehicle. Evidence was presented to prove that defendant intended to drive to Texas where his brother was expecting the return of his vehicle. Furthermore, even if the victim voluntarily entered defendant's vehicle for a ride to her home, her consent ceased at the point when he refused to stop the vehicle at her request. *State v. Gray*, 41,732 (La. App. 2 Cir. 1/10/07), 948 So. 2d 335, 340–41. Ms. Walker testified that defendant told the victim the only way she could leave the vehicle was to jump out. In *State v. Davies*, the victims consensually and voluntarily got into the defendant's vehicle. *Davies*, 35,783 (La. App. 2 Cir. 4/5/02), 813 So.2d 1262, 1263-67, *writ denied*, 02-1564 (La. 5/9/03), 843 So.2d 389. In that case, the victims repeatedly asked the defendant to take them home, but he passed the exit closest to the girls' homes and continued to drive along the

interstate. Both girls eventually jumped from the defendant's vehicle, and only one survived. The Louisiana Second Circuit held that the evidence was sufficient to convict the defendant of two counts of second degree kidnapping and one count of second-degree murder.[14]

Alternatively, kidnapping can be proven when the victim is enticed or persuaded. Following the testimony that defendant usually brought the victim home to New Orleans after work on Bourbon Street, it would be reasonable to infer that defendant enticed the victim to get in his vehicle to bring her home. Ms. Wright testified that the victim's belongings were still at her house and she had borrowed her mother's make up, indicating that the victim believed she would be coming home after work. As the vehicle passed numerous interstate exits after the most direct exit to her home from downtown New Orleans, the jury could find that the victim was not expecting to continue on the I-10 towards Kenner and Texas.

The third alternative element of kidnapping by imprisonment was also supported by the evidence that the victim jumped out of defendant's moving vehicle on the interstate. A reasonable juror could infer from this desperate act that the victim was held against her will in defendant's vehicle. As discussed in more detail in defendant's third assignment of error, the evidence of defendant's other acts during the weeks preceding June 10, 2015, support the conclusion that the victim would be unwilling to return to Texas to engage in further acts of prostitution for the defendant. The State called many witnesses and presented substantial evidence as to the defendant's other acts in coercing, or at least aiding, the victim in prostitution, to show why the victim would not be willing to return to Texas with defendant. The jury could reasonably infer that the victim was an

---

[14] In the *Davies* case, the defendant threatened to kill the girls, demanded sex from them, fondled one of the victims, and had a bat and a knife in his possession. He was also convicted of two counts of attempted aggravated rape. *State v. Davies*, 35,783 (La. App. 2 Cir. 4/5/02), 813 So.2d 1262, 1263-67, *writ denied*, 02-1564 (La. 5/9/03), 843 So.2d 389

13

unwilling passenger in defendant's vehicle if she felt she had to escape by jumping out of a moving vehicle.

Furthermore, after the victim jumped out of his vehicle, defendant disposed of the victim's belongings and continued driving to Texas, instead of calling for help or immediately contacting the victim's friends and family members. Defendant also asked Ms. King not to tell Ms. Wright that he was headed to Texas. These actions indicated that defendant had a guilty conscience. Evidence of flight, concealment, and attempt to avoid apprehension is relevant and admissible to prove consciousness of guilt from which the trier-of-fact may infer guilt. *State v. Bellow*, 08-259 (La. App. 5 Cir. 7/29/08), 993 So.2d 307, 316, *writ denied*, 08-2109 (La. 4/13/09), 5 So.3d 162.

Ultimately, it is reasonable that the jury could believe the testimony of the witnesses regarding defendant's admissions and reasons the victim would be unwilling to go to Texas with defendant. Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. *State v. Humphery*, 14-519 (La. App. 5 Cir. 11/25/14), 165 So.3d 937, 942. Accordingly, the reviewing court's role is not to assess credibility or reweigh evidence. *State v. Gordon*, 11-373 (La. App. 5 Cir. 4/24/12), 94 So.3d 29, 34, writ denied, 12-1189 (La. 10/8/12), 98 So.3d 851 (citing *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442, 443). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *Gordon*, 94 So.3d at 34 (*citing State v. Robinson*, 02-1869 (La. 4/14/04), 874 So.2d 66, 79*, cert. denied*, 543 U.S. 1023, 125 S.Ct. 658, 160 L.Ed.2d 499 (2004)). Multiple witnesses testified to defendant's admissions that the victim jumped from his vehicle which provide a reasonable basis for jurors to infer that the victim was

an unwilling passenger. While Ms. Walker's testimony of defendant's admissions to his brother provides the only evidentiary support for the element of force, the jury could have chosen to find her credible and we do not find the admission of her testimony to be erroneous, as we will detail further during our discussions of assignments of error four and five.

The element of the physical injury of the victim is required to prove the second degree kidnapping felony and the element of the killing of a human being, necessary for second degree murder. The State presented evidence that the victim's body was found on the interstate in pieces as a result of her escape from the vehicle. The coroner found a massive amount of trauma to the body leading to her death.

The defendant's alternative hypothesis, that defendant let the victim out of his car on the side of the highway, is not sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. No witness testified to the defendant making that assertion and the assertion is inconsistent with the findings of the crime scene investigators. Therefore, when viewing the evidence in the light most favorable to the prosecution, the State presented sufficient evidence to prove that defendant committed second degree kidnapping of the victim, which led to her death and, thus, to support his conviction of second degree murder.

Assignment of Error Number Two

In his second assignment of error, defendant argues that the trial court erred in accepting Lieutenant Hare as an expert witness. He contends that the trial court did not perform its "gatekeeping" function when it failed to consider the standards for determining the reliability of expert testimony enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469

15

(1993).  He argues for the first time on appeal that Lt. Hare's theories have not been proven reliable and should not have been considered as the basis for an expert opinion by the jury.

On July 18, 2017, the State filed a motion to qualify Lt. Hare as an expert witness in the field of human trafficking to assist the jury in understanding that defendant's actions and behaviors were consistent with human trafficking activity. The State wanted Lt. Hare's expert testimony to corroborate other evidence to show that defendant forcibly seized, enticed, or persuaded the victim.  The defense asserted there was no doubt that Lt. Hare could testify as an expert regarding human trafficking; however, such expert testimony was unnecessary to this case since defendant was not charged with human trafficking.  Defendant argued that such testimony would prejudice the jury against him and offer no probative value.

In determining the admissibility of expert testimony, trial courts are guided by the three-prong inquiry adopted by the Louisiana Supreme Court derived from Louisiana Code of Evidence article 702.[15]  *Cheairs v. State ex rel. Department of Transp. And Development*, 03-0680 (La. 12/3/03), 861 So.2d 536.  The trial court should determine if:

> (1) the expert is qualified to testify competently regarding the matters he intends to address;
> (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as  determined by the sort of inquiry mandated in *Daubert*;[16] and
> (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

---

[15] La. Code of Evidence article 702 provides the general rule for admissibility of expert testimony on the conditions that:
> (1)  The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (2) The testimony is based on sufficient facts or data;
> (3) The testimony is the product of reliable principles and methods; and
> (4) The expert has reliably applied the principles and methods to the facts of the case.

[16] The inquiry set out by the Supreme Court in *Daubert* addresses the reliability and validity of an expert's methodology or reasoning by considering: the testability or refutability of the expert's theory or technique; whether the technique has been subjected to peer review and/or publication; the known or potential rate of error; and whether the technique or methodology is generally accepted by the scientific community. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593–594, 113 S.Ct. 2786, 125 L.Ed.2d. 469 (1993).

*Cheairs*, 861 So.2d at 542 (citing *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), *certs. denied*, 528 U.S. 812, 120 S.Ct. 309, 145 L.Ed.2d 42 (1999) and 528 U.S. 812, 120 S.Ct. 47, 145 L.Ed.2d (1999)).

The determination of whether scientific evidence is reliable and will aid the jury comes after balancing the probative value of the evidence against its prejudicial effect. *State v. Foret*, 93-0246 (La. 11/20/1993), 628 So.2d 1116, 1123; *State v. Catanese*, 368 So.2d 975, 978-79, 983. (La. 1979). Competence of an expert witness is a question of fact to be determined within the sound discretion of the trial judge whose rulings on the qualifications of expert witnesses will not be disturbed absent an abuse of discretion. *State v. Otkins-Victor*, 15-340 (La. App. 5 Cir. 5/26/16), 193 So.3d 479, 525, writ denied, 16-1495 (La. 10/15/18), 253 So.3d 1294.

At trial, defense challenged Lt. Hare's qualifications as an expert under the first prong based on his lack of field work and membership in national organizations.[17] While defendant raised the issue of lack of peer review to Lt. Hare's lectures and lack of authorship, he failed to raise a specific reliability challenge to Lt. Hare's methodology or theories requiring a *Daubert* inquiry under the second prong. *State v. Torregano*, 03-1335 (La. App. 5 Cir. 5/11/04), 875 So.2d 842, 847. The only issue before this Court is whether the expert is qualified and whether his expertise assisted the trier of fact in understanding the evidence or determining a fact in issue, not the reliability of his theories.

Prior to jury selection, the trial court heard testimony from Lt. Hare to determine if he was qualified to testify as an expert. Lt. Hare provided that he has

---

[17] Prior to trial, defendant filed a motion in opposition to the State's request to have Lt. Hare deemed an expert, on the basis of the witness's testimony being more prejudicial than probative. Defendant argued that as he was not charged with sex and/or human trafficking, Lt. Hare's testimony was unnecessary and would only prejudice the jury against defendant.

been a law enforcement officer for a total of thirty-three years, thirteen of which were in vice-related investigations, while employed with both the JPSO and the New Orleans Police Department (NOPD). He has participated in an estimated two thousand vice investigations involving street-level prostitution, Internet prostitution, pandering, and human and sex trafficking. At the time of trial, he was the JPSO Commander of the Vice Division and estimated that the vice unit spent ninety-nine percent of its time investigating sex and human trafficking.

Lt. Hare detailed for the court that he had attended educational and training programs hosted by the Law Enforcement Investigators Alliance and the Western States Vice Investigators Association geared towards vice investigations and sex trafficking. He estimated that he had taken seven courses related to the culture and language, control methods, and transportation and locale of prostitution and sex trafficking. Additionally, Lt. Hare recounted that he had managed a grant to JPSO for the purpose of investigating complaints of human trafficking. As part of the grant, Lt. Hare worked with the Louisiana Human Trafficking Task Force during which time he attended a human trafficking class in Washington D.C. He also formed relationships with personnel at hotels and motels resulting in their assistance in human trafficking and prostitution investigations.

Lt. Hare has lectured on the "pimp, prostitute subculture" — or "the game" — and how to identify evidence of it in mainstream culture. Since 2006, he has given his lecture approximately nine times in Mississippi and Louisiana. In 2016, Lt. Hare was chosen to speak to Attorney General Loretta Lynch during her visit to New Orleans about law enforcement's problems with human and sex trafficking. He also provided that the methods and techniques that he has studied in other areas were consistent with those employed in his own area of investigations.

Finally, Lt. Hare testified that he has never been deemed an expert by any court. He denied being a member of any national organization or having any kind of certification in his field. He further denied authoring any articles in the field or giving presentations that were graded by his peers. Defendant argued that he should not be deemed an expert since he had "not done enough work in this field to be deemed an expert," had not had his work criticized or reviewed by his peers or any articles published, and was not a member of any national organization or received any certification from a national organization. The State compared Lt. Hare's experience to that of a narcotics expert, whose expertise stemmed from his experience on the job.

The trial court ruled that Lieutenant Hare was qualified to be an expert in the field of human trafficking, specifically with regard to subculture and language, the advertising and arrangement of transportation, locale recruitment, and control methods. Lt. Hare has specialized knowledge, or expertise, from his extensive experience and training in the field. Although his presentation was not the subject of peer review, this Court has stated that "[s]cholarly writing and peer review are not commonly associated with police work." *State v. White*, 14-631 (La. App. 5 Cir. 12/23/14), 168 So.3d 664, 667-68. This Court has allowed law enforcement personnel with extensive experience in narcotics investigations to offer expert opinion on the difference between drug dealers and users without scientific credentials or a scientific method. *Id*. Therefore, we find that the trial court did not abuse its discretion in finding that Lt. Hare was qualified to testify competently to matters in the field of human trafficking.

Lt. Hare's testimony was relevant in assisting the trier of fact in understanding the evidence, particularly the relationship between the victim and the defendant. Several federal appellate courts have affirmed the admissibility of

the testimony of law enforcement officers as experts to testify about the relationship between prostitutes and pimps in sex trafficking cases. *See, e.g., United States v. Warren*, 2019 WL 2156533, (4th Cir. 2019) at *3 (finding no abuse of discretion in admitting expert testimony on the typical manner in which human trafficking operates); *United States v. Anderson*, 560 F.3d 275, 281 (5th Cir. 2009) (finding no abuse of discretion in allowing expert testimony on the behavior of pimps); *United States v. Bryant*, 654 Fed.Appx. 807, 814 (6th Cir. 2016) (finding no abuse of discretion in admitting expert testimony by agent because the jury is not generally equipped to evaluate the testimony as to the complicated pimp/prostitute relationship), *cert. denied*, 137 S. Ct. 412 (2016); *United States v. Geddes*, 844 F.3d 983, 991 (8th Cir. 2017) (finding no abuse of discretion in admitting expert testimony on the nature of sex trafficking operations); *United States v. Taylor*, 239 F.3d 994, 998 (9th Cir. 2001) (finding the district court correctly ruled that an academic expert's testimony on relationship between prostitutes and pimps was relevant because a trier of fact who is in the dark about that relationship may be unprepared to assess the veracity of an alleged pimp, prostitute, or other witness testifying about prostitution); *United States v. Sutherland*, 191 F. App'x. 737, 740–41 (10th Cir. 2006) (finding no abuse of discretion in allowing expert testimony on the general methods of prostitute recruitment and management). The federal courts have generally found expert testimony to be relevant in explaining the subculture of prostitution and sex trafficking, because the subculture is not common knowledge, and it is helpful to the jury to better understand and evaluate the testimony of sex trafficking victims.[18]

---

[18] Federal courts have limited experts in human trafficking to providing testimony which educates the jurors and assists jurors in making the determination of whether the charged offense of human trafficking can be construed from a defendant's behavior without making legal conclusions. *See Meganathan v. Signal Int'l L.L.C.*, No. 1:13-CV-497, 2015 WL 11109846, at *11 (E.D. Tex. June 26, 2015); *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 514 (D. Md. 2014)

Lt. Hare's testimony on the complex relationship between prostitutes and pimps demonstrated that there could be a romantic aspect to the relationship, which could look like a boyfriend-girlfriend relationship, if the pimp is still trying to lure the prostitute into "the game." In this case, it appears the State used Lt. Hare's testimony about the five phases of recruitment — the recruitment, seduction, isolation, coercion and violence, and refraining stages — to mimic the ups and downs of defendant's and the victim's relationship and to prove a coercive nature of defendant's actions toward the victim. The State presented evidence that defendant attempted to isolate the victim during the trip to Texas with Star, attempted to scare the victim by leaving her at the hotel but then coming back to get her, and stealing money from her wallet. Without Lt. Hare's testimony, the jury could have inferred that defendant was only a controlling boyfriend. The jury could have also interpreted defendant's more tender text messages, when he said he loved the victim and that she had hurt him, as messages between a couple fighting. However, Lt. Hare's expert testimony served to show that defendant's tenderness was a mere act to recruit, seduce, and control the victim for his own financial benefit.

Furthermore, Lt. Hare's testimony was used to explain Ms. Johnson's testimony and evaluate her credibility, showing that as a victim of trafficking she would minimize defendant's illegal behavior and call him her boyfriend instead of her pimp. Also, Lt. Hare sought to explain that defendant was not just flirting with Ms. King on the eve of the victim's death but was seeking to recruit her as part of his human trafficking enterprise.

Therefore, we do not find the trial court abused its discretion in allowing Lt. Hare's opinion testimony to explain the relationship between the victim and defendant to assist the jury in understanding the evidence. The trial court could

find the probative value of Lt. Hare's testimony, as it relates to providing context for the victim's and defendant's relationship, outweighed the prejudice to defendant, or the possibility of confusion of the jury.

Assignment of Error Number Three

In defendant's third assignment of error, he argues that the trial court erred in allowing the State to introduce evidence that defendant engaged in prostitution and/or human or sex trafficking. Defendant alleges that by introducing the litany of evidence that defendant was involved in the prostitution of the victim and Ms. Johnson, the jury most likely concluded that defendant was a man of bad character and thus must have kidnapped the victim. He further argues that the State failed to specify the purpose for which it sought to admit the other acts but, rather, insufficiently alleged that the acts were relevant for a "material purpose." He claims the evidence introduced was wholly unrelated to the charge of second degree felony murder with an underlying felony of second degree kidnapping and that the evidence was more prejudicial than probative.

During pre-trial proceedings, the State filed a Notice of Intent to Introduce Evidence of Other Acts under seal, in accordance with *State v. Prieur*, 277 So.2d 126 (La. 1973).[19] The State argued that the evidence of prostitution and pandering

---

[19] The State set forth nine other acts to be admitted at trial. 1) In April of 2015, defendant was engaged in the enticing, placing, persuading and/or encouraging of Ms. Johnson in the practice of prostitution and transported her to various places in Texas and assisted her in engaging in prostitution. 2) Shortly after meeting the victim in New Orleans, he recruited her to travel with him and Ms. Johnson to engage in prostitution in many cities in Texas, where he managed and promoted the prostitution enterprise of the victim and Star and benefitted financially from doing so. 3) On May 23, 2015, the victim was in Addison, Texas when she contacted the police department after she and defendant entered into a verbal argument, and he took $200.00 from the victim's purse. When the police came to assist the victim in retrieving her belongings from the room, the room was empty. 4) After the Texas incident, the victim called Ms. Bernard crying and requesting assistance, so a family friend, Deshon Johnson, bought the victim a bus ticket leaving from Dallas to Houston the next morning. The victim never got on the bus. 5) On May 24, Ms. Bernard called the New Orleans Police Department to report the victim was missing after hearing from a friend that the victim was being forced into prostitution in Texas. 6) To appease her family's concerns, the victim posted a video in Instagram telling her family that she was okay. 7) On May 30, 2015, Ms. Johnson abruptly left defendant without telling him. After she left, defendant began to send her threatening text messages saying he would harm her. 8) On June 2, defendant transported the victim back to New Orleans to visit family and friends. The victim was working at Stiletto's and was brought to and from work by defendant, and family and friends noticed the victim's changed behavior and defendant imposing restrictions on her behavior. Also, witnesses told police that defendant attempted to recruit another female to engage in the practice of prostitution. Family and friends were not aware of any plan for the victim to return to Texas with defendant. 9) Early on June 10, 2015, defendant forced the victim into his vehicle and began to transport her to Texas against her will. During the ride, the victim asked to be let out of the vehicle, and defendant refused. The victim attempted to escape by jumping out of the moving vehicle, which

engaged in by defendant and the victim's desire to return to her family after altercations with defendant demonstrated that the victim did not want and had no plans to return to Texas the morning of her death. The State sought to introduce the evidence of the events leading up to the victim's death and evidence of the ongoing prostitution enterprise as acts integral to the murder. The State claimed without this evidence of the relationship between victim and defendant, the jury would be unable to determine that the victim was an unwilling occupant in defendant's vehicle.

Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. La. C.E. art. 404(B)(1); *Prieur*, 277 So.2d at 128. However, when evidence of other crimes or bad acts tends to prove a material issue and has independent relevance other than to show that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to this rule. *State v. Garcie*, 17-609 (La. App. 5 Cir. 4/11/18), 242 So.3d 1279, 1284; *State v. Williams*, 10-51 (La. App. 5 Cir. 7/27/10), 47 So.2d 467, 474, *writ denied*, 10-2083 (La. 2/18/11), 57 So.3d 330. Evidence of other crimes is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding to such an extent that the State could not accurately present its case without reference to the prior bad acts. La. C.E. art. 404(B)(1).

The test of integral act evidence is whether the State in structuring its case to avoid any mention of uncharged acts, would be deprived of narrative momentum and cohesiveness, "with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to

---

resulted in her death, and defendant failed to stop the vehicle, render aid, or contact authorities and instead drove to Texas.

reach an honest verdict." *State v. Colomb*, 98-2813 (La. 10/1/99), 747 So.2d 1074, 1076) *quoting Old Chief v. United States*, 519 U.S. 172, 187, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997). A close connexity between the preceding acts and the charged conduct is required to ensure the purpose served is to complete the story of the crimes on trial by proving the immediate context of happenings in time and place. *See State v. Charles*, (La. App. 5 Cir. 6/27/01), 790 So.2d 705, 708. The State is required to make a showing of sufficient evidence to support the finding that defendant committed the other acts. *State v. Taylor,* (La. 12/1/16), 217 So.3d 283, 291.

In order for other crimes evidence to be admitted under La. C.E. art. 404(B)(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. *State v. Lawson*, 08-123 (La. App. 5 Cir. 11/12/08), 1 So.3d 516, 525-26. Moreover, the probative value of the extraneous evidence must outweigh the prejudicial effect. La. C.E. art. 403. The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. *State v. Miller*, 10-718 (La. App. 5 Cir. 12/28/11), 83 So.3d 178, 187, writ denied, 12-0282 (La. 5/18/12), 89 So.3d 1191, cert. denied, 568 U.S. 1157, 133 S.Ct. 1238, 185 L.Ed.2d 177 (2013). Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to La. C.E. art 404(B)(1) will not be disturbed. *State v. Maize*, 16-575 (La. App. 5 Cir. 6/15/17), 223 So.3d 633, 649, writ denied, 17-1265 (La. 4/27/18), 241 So.3d 306.

The probative value of the evidence must outweigh its prejudicial effect of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. *State v. Galliano*, 2002–2849 (La. 1/10/03), 839 So.2d 932, 933. As used in the balancing test, the introduction of

probative evidence of prior misconduct is prohibited only when it is unduly and unfairly prejudicial. *State v. Germain*, 433 So.2d 110, 118 (La.1983). The term "unfair prejudice," speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged. *State v. Rose*, 2006–0402, p. 13 (La.2/22/07), 949 So.2d 1236, 1244, *citing Old Chief v. United States*, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997); *State v. Henderson*, 2012-2422 (La. 1/4/13), 107 So. 3d 566, 567–68.

The trial court did not abuse its discretion in finding that the defendant failed to meet his burden of proving undue prejudice. Clearly, evidence of other crimes or bad acts is prejudicial since all evidence that tends to make it more probable than not that an individual committed a criminal offense is necessarily prejudicial. *State v. Williams*, 02-645 (La. App. 5 Cir. 11/26/02), 833 So.2d 497, 507, *writ denied*, 02-3182 (La. 4/25/03), 842 So.2d 398. The underlying policy is not to prevent prejudice but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime. *Id.* In the *Williams* case, evidence of the defendant's involvement in gangs was introduced, as well as testimony of a gang expert on gang culture and its signs and language. This Court found although the fact that a defendant was a gang member could create the image of a bad person for the jury it was relevant to establish defendant's motive to injure victims affiliated with a rival gang.

In the instant case, the State proceeded under the theory that the defendant was engaged in the perpetration or attempted perpetration of the second degree kidnapping of the victim at the time she died. The State offered evidence regarding defendant's prostitution of Ms. Johnson and the victim, which was relevant to providing the context of the victim and defendant's relationship in the

25

preceding month, in Texas, a place to which it could be inferred the defendant was transporting the victim. The relevance of these integral acts outweighed the prejudice of establishing the defendant as a pimp, and possibly creating the image of a bad person.

In *State v. Taylor*, 01-1638 (La. 1/14/03), 838 So.2d 729, 740, *cert. denied*, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004), the trial court admitted evidence of a defendant's involvement in a seven-day crime spree through several states that occurred after the date of the charged offense. The Louisiana Supreme Court upheld the admission "under the rule of narrative completeness incorporated in the res gestae doctrine" which allows the story to be told in its entirety, proving its immediate context of happenings in time and place. *Id*. at 742. In *State v. Rhea*, 03-1273 (La. App. 5 Cir. 2/23/04), 868 So.2d 863, 867, a defendant prosecuted for attempted second degree murder argued that evidence of other crimes, including kidnapping, should have been excluded as unduly prejudicial. In affirming the trial court's admission of the evidence, this Court noted that the attempted second degree murder of the victim did not occur in a vacuum, but "the events were so intertwined with the attempted murder that the State could not have told the complete story to the jury without evidence of these events." *Id*. at 868.

The trial court properly admitted evidence of defendant's involvement in the prostitution of both Ms. Johnson and the victim. It appears the admission of this evidence was necessary for the State to logically present its case and to explain the dynamic of the relationship between the victim and defendant, such as his increasing control over the victim and how he used the victim as a source of profit. To fulfill the element of kidnapping, the State had to prove that defendant either forcibly seized or carried the victim from one place to another, enticed or persuaded her from one place to another, or imprisoned or forcibly secreted her.

*See* La. R.S. 14:44.1(B). It appears that the integral act evidence presented revealed the true nature of defendant's relationship with the victim, one of a pimp and a prostitute rather than a boyfriend and a girlfriend. This evidence was substantially relevant to show why the victim felt compelled to jump out of the vehicle to get away from defendant. As the State argued at the hearing, the enterprise of prostitution "is going in the background of the entirety of the events that transpired prior to the death" of the victim.

At the hearing, the defense attorney argued that the State should provide a proper purpose for each of the nine acts sought to be introduced. It appears that the State may have overreached in the amount of evidence it sought to introduce relating to the defendant's prostitution enterprise, and instead attempted to introduce all acts relating to the victim's lack of intent to return to Texas. To prove the victim's state of mind, the State sought to introduce evidence under Acts IV., V., and VI., which were acts of the victim, as well as acts of her family and friends.[20] While the admissibility of these acts by persons other than the defendant under La. C.E. art. 404(b) may have been erroneous, any error was harmless as it was otherwise admissible. These acts had independent relevance, and the verdict was unattributable to the error of allowing evidence of the acts of the victim's family and friends as La. C.E.404(B) evidence. *State v. Battie* (La. App. 5 Cir. 5/19/99), 735 So.2d 844, 852.

Assignment of Error Number Four

In defendant's fourth assignment of error, he challenges the trial court's denial of his motions for mistrial. Defendant alleges the trial court erred when it denied his motion for a mistrial after the State failed to provide him with Ms.

---

[20] This evidence later was testified to by Ms. Bernard and Ms. Deshon Johnson to show the control defendant had over the victim.

Cooper's statement that the victim's bruises were caused by dancing on a pole. He also alleges the denial of his motion for mistrial based on Ms. Walker's violation of the witness sequestration order.[21]

A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to a defendant that deprives him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion. *State v. Adams*, 13-992 (La. App. 5 Cir. 5/21/14), 142 So.3d 265, 272, *writ denied*, 14-1245 (La. 2/6/15), 158 So.3d 813.

*Mistrial for Failing to Disclose Evidence of Bruising*

As to the State's failure to disclose Ms. Cooper's statement, defendant more specifically alleges that this was favorable and material evidence which required disclosure under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In response to the State's question of what happened on Saturday night after the victim and defendant talked, Ms. Cooper testified that she noticed bruises on the victim's arms and between her legs and that the victim indicated that the bruises were from "the pole." Ms. Cooper stated that she had never seen bruises on the victim before, despite her working as a dancer. Following Ms. Cooper's testimony at trial, defense counsel stated that the State failed to disclose any information about the cause of the bruising which should have been provided before trial. Defendant then moved for a mistrial for the State's failure to disclose the information during discovery. The trial court denied the request for a mistrial.

The defendant's motion for mistrial was untimely, and this issue is not preserved since trial counsel only moved for a mistrial after the conclusion of Ms.

---

[21] In his motion for new trial, defendant argued the trial court erred in failing to grant his motions for mistrial. On appeal, defendant does not appear to challenge the trial court's ruling denying his motion for new trial, only the denial of the motions for mistrial.

28

Cooper's testimony. In *State v. Broaden*, 99-2124 (La. 2/21/01), 780 So.2d 349, 361, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001), the Louisiana Supreme Court found the defendant's motion for mistrial was untimely because "[t]here was no objection to the initial question or follow-up queries. The State completed its re-direct, [the witness] was told she could step down, and jurors were removed for the lunch break. It was only then that the defense moved for a mistrial." The record reflects that in the present case, defense counsel did not object to the witness's testimony regarding the bruising. Counsel did cross-examine her on her prior statements to law enforcement that she had no knowledge of defendant being violent toward the victim. Defendant did not move for a mistrial until after the State's redirect of the witness, after the jury was excused for lunch, and after the witness was advised that she was released but would remain under subpoena. Therefore, we find this motion was untimely.

Furthermore, we do not find that Ms. Cooper's testimony regarding the victim's explanation for the source of her bruises is the type of evidence necessary for disclosure under *Brady*. There are three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); *State v. Louviere*, 00-2085 (La. 9/4/02), 833 So.2d 885, 896, *cert. denied*, 540 U.S. 828, 124 S.Ct. 56, 157 L.Ed.2d 52 (2003). Exculpatory evidence by definition is that "which tends to justify, excuse or clear the defendant from alleged fault or guilt." *State v. Lande*, 06-24 (La. App. 5 Cir. 6/28/06), 934 So.2d 280, 296, *writ denied*, 06-1894 (La.4/20/07), 954 So.2d 154, (*citing* Black's Law Dictionary, Sixth Edition). Ms. Cooper's testimony in regard to the bruising she observed and the victim's disclosure of the source of bruising neither implicated nor cleared the

defendant. The State did not solicit information of bruising, nor were the bruises attributed to defendant. The State's case did not focus on physical violence by defendant towards the victim to prove the second degree kidnapping or second degree murder. Thus, the State was not required to disclose evidence that did not exculpate the defendant from the charged offenses.

*Mistrial for Violation of Sequestration Order*

Defendant's second argument is that his motion for mistrial should have been granted after Ms. Walker admitted she had watched four to six minutes of news coverage about the trial that morning. The defendant, however, did not move for a mistrial based on Ms. Walker's alleged violation of the witness sequestration order but rather asked for the trial court to bar her testimony.[22] Where a defendant does not request a mistrial and no grounds exist for the trial court to order a mistrial *sua sponte*, the trial court does not err in failing to grant one. *State v. Day*, 14-708 (La. App. 3 Cir. 12/23/14), 158 So.3d 120, 128 (citing *State v. Passman*, 345 So.2d 874 (La. 1977)). A violation of the sequestration order does not warrant a mistrial absent an indication that the infraction materially prejudiced the defendant. *State v. Humbles*, 14-643 (La. App. 5 Cir. 3/11/15), 169 So.3d 547, 555, writ denied, 15-0725 (La. 3/24/16), 190 So.3d 1195.

If the defendant is attempting to appeal the denial of the trial judge's motion to exclude Ms. Walker's testimony, the trial judge's determinations of disqualification for violations of sequestration rules will not be disturbed on appeal absent a clear showing of abuse of discretion. *State v. Draughn*, 05-1825 (La. 1/17/07), 950 So.2d 583, 621, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007) (*citing State v. Stewart*, 387 So.2d 1103, 1107 (La. 1980)). La.

---

[22] The transcript reflects that after the defendant's request that the court bar Ms. Walker's testimony, the trial court denied "the motion for a mistrial," and noted defense's objection to the ruling. The minute entry also incorrectly reflects that a motion for mistrial was made and ruled upon. (R., p. 22).

C.Cr.P. art. 764 provides that the exclusion of witnesses is governed by La. C.E. art. 615, which allows a court to impose appropriate sanctions for violations of its exclusion order including contempt, appropriate instructions to the jury, or when such sanctions are insufficient, disqualification of the witness. "The purpose of the sequestration article is to prevent witnesses from being influenced by the testimony of earlier witnesses, and to strengthen the role of cross-examination in developing the facts." *State v. Breaux*, 12-0555 (La. App. 4 Cir. 2/27/13), 110 So.3d 281, 284, *writ denied*, 13-0699 (La. 10/25/13), 124 So.3d 1093.

The record reflects that after the parties' opening statements, the trial court stated "[t]here will be a sequestration order in effect." It does not reflect that any of the witnesses were told to not watch the news. Before her testimony, Ms. Walker admitted to watching five or six minutes of news coverage that morning and recalled that the news report stated that defendant had hit his girlfriend with his car and then kept going. It appears based on the sequestration article that this was not a true violation of the sequestration order as she did not speak to anyone and was not exposed to the proceedings. It does not appear that the purpose of the sequestration article would be served by excluding Ms. Walker's testimony as her testimony was not influenced by the news report nor was defense counsel's ability to cross-examine her undermined by her exposure. The allegations Ms. Walker heard on the news were dissimilar to both what Ms. Walker previously reported to law enforcement in this case and her testimony at trial. Therefore, we find the trial court did not abuse its discretion in allowing Ms. Walker to testify. Furthermore, as there was no indication that the infraction materially prejudiced the defendant, there was no error in the denial of a mistrial.

Assignment of Error Number Five

In defendant's final assignment of error, he argues that the trial court erred in denying his motion for new trial on the basis of newly discovered evidence. He asserts that the State failed to disclose to the defense that there were two active arrest warrants out for Ms. Walker at the time she testified at trial. He also asserts that the knowledge of the arrest warrants would have brought Ms. Walker's credibility into question and would have produced a different verdict since she provided the only evidence to prove defendant committed second degree kidnapping.

La. C.Cr.P. art. 851(B)(3) directs a new trial upon the production of newly discovered evidence, provided that four requisites must be met: (1) the evidence must have been discovered since the trial; (2) the failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence; (3) the evidence must be material to the issues at trial; and (4) the evidence must be of such a nature that it would probably produce an acquittal in the event of a retrial. State v. Nelson, 09-807 (La. App. 5 Cir. 3/23/10), 39 So.3d 658, 665. Newly discovered evidence affecting only a witness' credibility as it is "merely cumulative or impeaching" is not an adequate basis for the grant of a new trial. *State v. Lyles*, 03-141 (La. App. 5 Cir. 9/16/03), 858 So.2d 35, 52 (*quoting Mesarosh v. United States*, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1 (1956)). The trial court's ruling as to whether these requisites are met is entitled to great weight, and a denial of a motion for new trial will not be disturbed on appeal absent a clear abuse of that discretion. *State v. McClain*, 04-98 (La. App. 5 Cir. 6/29/04), 877 So.2d 1135, 1142, *writ denied*, 04-1929 (La. 12/10/04), 888 So.2d 835.

Defendant's assertion requires a *Brady* inquiry as prosecutors have a duty to disclose evidence favorable to the defense, including evidence that impeaches the testimony of a witness whose credibility may determine guilt or innocence. *Brady*

*v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194; *Giglio v. U.S.*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). This Court has held that pending criminal charges against a witness is a valid area of cross-examination to determine whether the prosecution may have leverage over that witness. *State v. Williams*, 18-112 (La. App. 5 Cir. 11/7/18), 259 So.3d 563, 575-76, *writ denied*, 18-2038 (La. 4/22/19), 268 So.3d 295; *State v. Wiley*, 10-811 (La. App. 5 Cir. 4/26/11), 68 So.3d 583, 592, *writ denied*, 11-1263 (La. 3/30/12), 85 So.3d 106.

A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the "omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). For purposes of *Brady*'s due process rule, a reviewing court determining materiality must ascertain not whether the defendant would have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).

The Supreme Court found that when the State failed to disclose that the possibility of a reward was made to its witnesses, there was "a significant likelihood that the prosecutor's response to respondent's discovery motion misleadingly induced" defense counsel to believe its witnesses could not be impeached on the basis of bias or interest. *United States v. Bagley*, 473 U.S. 667, 683, 105 S.Ct. 3375, 3380, 49 L.Ed.2d 342 (1976). The Government failed to assist the defense by disclosing information that might have been helpful in conducting the cross-examination, however, reversal is required only if the evidence withheld is "material" as defined as a "a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3375, 3380.

In the case at bar, the State did not "misleadingly induce" defense counsel to believe Ms. Walker could not be impeached as the disclosed criminal history noted outstanding warrants for Ms. Walker, as well as several criminal convictions.[23] Furthermore, at the hearing on the motion for new trial, defendant was unable to convince the trial court that the witness would have been impeached on the basis of bias or interest arising from the hope of leniency from the State on the charges. Ms. Walker's pending charges were in Texas, outside of the jurisdiction of the district attorneys, who were unaware of the charges; Ms. Walker testified that she was unaware of the warrants at the time of her testimony; and no conversations had taken place between the district attorney's office and the witness to lead her to believe that she would receive help with any sentence.

Most importantly, we do not find that disclosure of these particular outstanding warrants would have led to a different result. Defendant argues that Ms. Walker's warrants for crimes involving "dishonest and deceitful behavior" would have been compelling evidence for the jury to consider in assessing her credibility. However, the Louisiana Code of Evidence specifically provides that evidence of an arrest, arrest warrant, indictment, prosecution, or acquittal may not be used to impeach the witness' general credibility. La. C.E. art. 609.1.[24] Furthermore, defendant was in possession of a criminal history for the witness which contained an outstanding warrant and numerous felony convictions for "dishonest and deceitful" crimes, and yet failed to attack Ms. Walker's credibility

---

[23] Defendant's trial defense counsel, Nandi Campell, testified that she had received pretrial discovery from the State, including rap sheets on initial discovery and again a month prior to trial. She testified that they did not reveal these outstanding warrants. She did acknowledge seeing an entry regarding an outstanding warrant from August 4, 2015 referencing a probation violation.

[24] As discussed previously, pending criminal charges are relevant not to the witness's general credibility but to her bias or interest as relating to the hope of receiving leniency from the State in pending criminal charges. *State v. Wiley*, 10-811 (La. App. 5 Cir. 4/26/11), 68 So.3d 583, 592, writ denied, 11-1263 (La. 3/30/12), 85 So.3d 106.

and veracity. Upon consideration of these facts, we find that defendant cannot establish the prejudice necessary to satisfy *Brady*'s "materiality" inquiry and La. C.Cr.P. art. 851(B)(3)'s requirement that the evidence must be of such a nature that it would probably produce an acquittal in the event of a retrial. Therefore, we find the trial court did not abuse its discretion in finding no merit to defendant's argument.

Patent Error Discussion

Pursuant to our usual procedure, we reviewed the record for errors patent. See La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La.1975); *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir.1990). We find that the defendant was not advised of the time period for seeking post-conviction relief after imposition of his sentence as required by La. C.Cr.P. art. 930.8. It is well settled that if a trial court fails to advise pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief. *State v. Jacobs*, 07–887 (La. App. 5 Cir. 5/24/11), 67 So.3d 535, *writ denied*, 11–1753 (La.2/10/12), 80 So.3d 468.

Therefore, by way of this opinion, defendant is informed that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## CONCLUSION

The State presented sufficient evidence to convict defendant of second degree murder. The trial court did not err in admitting testimony from an expert in the field of human trafficking and evidence of other acts of the defendant's involvement in human trafficking under Louisiana Code of Evidence art. 404(b). The trial court's denial of defendant's motions for mistrial and motion for a new

trial based on Brady and sequestration violations were not clearly erroneous.

Therefore, for the reasons stated above, defendant's conviction is affirmed.

**CONVICTION AND SENTENCE AFFIRMED**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

MARY E. LEGNON
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



## FIFTH CIRCUIT
101 DERBIGNY STREET (70053)
POST OFFICE BOX 489
GRETNA, LOUISIANA 70054
www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**DECEMBER 4, 2019** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 18-KA-354

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HON. LEE V. FAULKNER, JR. (DISTRICT JUDGE)
TERRY M. BOUDREAUX (APPELLEE)          PAUL J. BARKER (APPELLANT)          ANDREA F. LONG (APPELLEE)
THOMAS J. BUTLER (APPELLEE)

### MAILED
KRISTEN LEGENDRE (APPELLANT)          HON. PAUL D. CONNICK, JR. (APPELLEE)
ATTORNEY AT LAW                        KELLIE M. RISH (APPELLEE)
700 CAMP STREET                        MEGAN L. GORMAN (APPELLEE)
SUITE 110                              ASSISTANT DISTRICT ATTORNEYS
NEW ORLEANS, LA 70130                  TWENTY-FOURTH JUDICIAL DISTRICT
                                       200 DERBIGNY STREET
                                       GRETNA, LA 70053